IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Rollins Ranches, LLC, and<br>British Gundogs, LLC,<br><br>                    Plaintiffs,<br><br>v.<br><br>Rachael Watson, *aka Rachael Corbett*,<br><br><br>                    Defendant. | Case No.: 0:18-cv-03278-SAL<br><br><br><br><br>**OPINION AND ORDER** |

This matter is before the court for review of the February 24, 2021 Report and Recommendation ("Report") of United States Magistrate Judge Shiva V. Hodges, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 (D.S.C.). [ECF No. 66.] In the Report, the Magistrate Judge recommends Plaintiffs' motion for default judgment, ECF No. 64, be denied and Plaintiffs' complaint, ECF No. 1, be dismissed without prejudice for failure to state a claim. Plaintiffs' timely filed objections to the Report. [ECF No. 69.] Defendant did not reply. The matter is ripe for ruling. For the reasons outlined herein, the court adopts the Report as outlined herein.

## BACKGROUND

In the Report, the Magistrate Judge set forth the background of this action thoroughly. The court adopts this background in full without a recitation.[1]

---

[1] Plaintiffs did not object to the Magistrate Judge's factual recitation.

## REVIEW OF A MAGISTRATE JUDGE'S REPORT

The court is charged with making a *de novo* determination of those portions of the Report to which specific objections are made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). A district court, however, is only required to conduct a *de novo* review of the specific portions of the Magistrate Judge's Report to which an objection is made. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); *Carniewski v. W. Virginia Bd. of Prob. & Parole*, 974 F.2d 1330 (4th Cir. 1992). In the absence of specific objections to portions of the Report, this court is not required to provide an explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

"An objection is specific if it 'enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.'" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 2017 WL 6345402, at *5 n.6 (D.S.C. 2017) (citing *One Parcel of Real Prop. Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996)). A specific objection to the Magistrate Judge's Report thus requires more than a reassertion of arguments from the complaint or a mere citation to legal authorities. *See Workman v. Perry*, No. 6:17-cv-00765-RBH, 2017 U.S. Dist. LEXIS 175597, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

"Generally stated, nonspecific objections have the same effect as would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 U.S. Dist. LEXIS 15489, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The court reviews portions "not objected to—including those portions to which

only 'general and conclusory' objections have been made—for clear error." *Id.* (emphasis added)

(citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

## DISCUSSION

Plaintiffs' specific objections to the Report are as follows:

1. The Report's review of Plaintiffs' complaint under a 12(b)(6) standard is improper and resolves all inferences in Defendant's favor;

2. The Report improperly *sua sponte* raises First Amendment issues with regard to the defamation claims and incorrectly construes Defendant's Facebook statements as hyperbole;

3. In finding Plaintiffs failed to state a claim for tortious interference and civil conspiracy the Report unfairly penalizes Plaintiffs' compliance with the court's order to produce an estimate of damages, ECF No. 61, "not to anticipate and rebut unraised arguments on defaulted claims while rewarding Defendant's repeated discovery abuses";

4. The Report improperly criticizes Plaintiffs' request for damages, attorneys' fees, and costs as the request is supported by admitted allegations in the complaint and Plaintiffs' damages estimate, and in doing so, the Report unfairly rewards Defendant's repeated discovery abuses.

[ECF No. 69 at 22–23]. The court will review these portions of the Report *de novo*.

## I.    The Magistrate Judge properly reviewed the complaint.

Plaintiffs argue that the Magistrate Judge improperly applied a 12(b)(6) standard of review to

their complaint. [ECF No. 69 at 4.] Plaintiffs' position is as follows:

> The Report correctly acknowledges that because default was entered against Defendant, Defendant is deemed to have admitted the factual allegations of the Verified Complaint against her. Despite this acknowledgement, the Report disregards facially sufficient, admitted facts stated in the Complaint which would immediately preclude dismissal. Instead, the Report *sua sponte* scrutinizes the Complaint under a heightened version of the Fed. R. Civ. P. 12(b)(6) standard.

*Id.* (internal citations omitted). Plaintiffs further question whether a 12(b)(6) review is required

prior to the entry of default judgment, noting:

> The Report draws authority to evaluate Plaintiffs' Complaint "against the standards of Fed. R. Civ. P. 12(b)(6)" from a footnote in a case from the Eastern District of

Virginia. Doc. 66 at 14 (quoting *Globalsantafe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 (E.D. Va. 2003)). Yet, the *Globalsantafe* footnote simply stated that "[u]pon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts as alleged state a claim." *Globalsantafe*, 250 F. Supp. 2d at 612. Neither *Globalsantafe*—nor the authorities cited by *Globalsantafe*—provide further discussion of the Rule 12(b)(6) standard of review. *See id.* (citing *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 187 F.3d 628 (4th Cir. 1999), and *Bonilla v. Trebol Motors Corp.*, 150 F.3d 77 (1st Cir. 1998)).

*Id.* at 4 n.1.

### A. Review of Plaintiffs' complaint under a 12(b)(6) standard was proper

Plaintiffs' motion for default judgment is governed by Fed. R. Civ. P. 55.[2] "Rule 55(b)(2) allows the court in its discretion to enter a judgment of default . . . ." *United States v. Ragin*, 113 F.3d 1233 (4th Cir. 1997). Although a defaulting defendant is held to have "admit[ted] the plaintiff's well-pleaded allegations of fact," he is not held to have admitted conclusions of law. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). "In short, despite occasional statements to the contrary, a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Id.*

As such, "[a] plaintiff's burden in moving for default judgment is not satisfied . . . by simply pleading facts; rather, the plaintiff's complaint must also state a cognizable claim to which his or her well-pleaded facts provide support and show an entitlement to relief." *Silvers v. Iredell Cty. Dep't of Soc. Servs.,* No. 515CV00083RLVDCK, 2016 WL 427953, at *4 (W.D.N.C. Feb. 3, 2016) (citing *Ryan*, 253 F.3d at 780), *aff'd*, 669 F. App'x 182 (4th Cir. 2016); *see also Broxton v. Blue Ridge in Fields*, No. CV 0:18-2022-JFA-PJG, 2019 WL 3315245, at *2 (D.S.C. July 24,

---

[2]  Plaintiffs did not object to the Report construing their estimate of damages, ECF No. 64, as a motion for default judgment.

2019) ("[T]he court must still determine if the unchallenged factual allegations constitute a legitimate cause of action and support the relief sought.").

Pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The 12(b)(6) standard is consistent with Fourth Circuit precedent requiring the court not to treat a default judgment as a confession of liability and to review the complaint to determine whether the admitted facts support a claim upon which relief can be granted. *See id.*; *Ryan*, 253 F.3d at 280. The court therefore finds that it was proper for the Magistrate Judge to "evaluate the plaintiff's complaint against the standards of Fed. R. Civ. P. 12(b)(6) to ensure that the complaint properly states a claim." [ECF No. 66 at 14.]

### B.  The Magistrate Judge did not apply a heightened standard of review

The Magistrate Judge correctly recognized that "[b]ecause Defendant is in default, [ECF No. 14], the allegations in Plaintiffs' complaint against Defendant are deemed admitted." [ECF No. 66 at 15] (citing Fed. R. Civ. P. 8(b)(6)). However, Plaintiffs allege that "the Report fails to draw reasonable inferences in Plaintiffs' favor and construe the facts in the light most favorable to Plaintiffs. Because this heightened level of scrutiny permeates the entire Report, the Report should be rejected in its entirety." [ECF No. 69 at 7.] Plaintiffs point to the following allegations as examples:

- The Report acknowledges that Defendant's warning to not "send dogs to be fried on an e collar by assholes there" implies that Plaintiffs mistreat dogs via e-collars and presents a "closer question" of fact on the defamation claim, yet the Report ultimately resolves that "closer question" of fact in the light most favorable to Defendant. ECF No. 66 at 19.

- The admitted facts in the Complaint expressly state that Defendant is a "stranger" to all of Plaintiffs' business relationships relevant to Plaintiffs'

claims, yet the Report construes the facts to conclude this assertion does not apply to each of the contracts for purposes of the tortious interference claim. ECF No. 66 at 24–25 n. 15.

- The admitted facts in the Complaint are that Defendant interfered with Kennel Club registration of Plaintiffs' dogs and caused special damages, yet the Report states that Plaintiffs fail to provide facts that give rise to a reasonable expectation of benefits from the alleged lost contract with The Kennel Club. ECF No. 66 at 26.

- The Report concludes that the potential employment contracts with specifically identified individuals were not sufficiently evidenced, rather than construing the admitted facts in the light most favorable to Plaintiffs and finding that these were legitimate prospects. ECF No. 66 at 26–27.

- And the Report simply presumes, in favor of Defendant, that the alleged damages on Plaintiffs' civil conspiracy claim do not exceed the damages alleged for Plaintiffs' other claims. ECF No. 66 at 27–28.

ECF No. 69 at 6–7.

These allegations do not demonstrate that the facts were construed against Plaintiffs merely because the conclusions of law the Report reached in applying the facts are not in Plaintiffs' favor. *See Papasan v. Allain, 478 U.S. 265, 286 (1986)* ("Although . . . we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.") The court finds that the Report properly construed the complaint's factual allegations as true and construed these facts in the light most favorable to Plaintiffs. The court has not found a heightened level of scrutiny that permeates the Report and would require a rejection in full, as Plaintiffs request. *See* [ECF No. 69 at 7.] Moreover, the court notes that it reviews *de novo* the objected to portions of the Report.

## II.     The Magistrate Judge properly analyzed Plaintiffs' defamation claims.

### A. First-Amendment analysis was appropriate.

Plaintiffs allege that "the Report *sua sponte* raises a First Amendment defense on Defendant's behalf, then misapplies South Carolina defamation law to improperly extend First Amendment

protection to Defendant's statements."  [ECF No. 69 at 7.]  However, the Report correctly noted that the court's inquiry is not only to assess whether the statements in the complaint "may constitute a sufficient basis for Plaintiffs' defamation claim," but also to consider whether such a claim would comport with the First Amendment.  [ECF No. 66 at 17] (citing *McGlothlin v. Hennelly*, 370 F. Supp. 3d 603, 614 (D.S.C. 2019) (holding that even though the plaintiff had sufficiently pleaded defamation under South Carolina law, "the court must first consider what limitations the First Amendment's right to free speech places on the reach" of the plaintiff's defamation suit); *Snyder v. Phelps*, 580 F.3d 206, 217 (4th Cir. 2009) ("It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment.")).

As the district court held in *McGlothlin*, "[a]lthough a plaintiff might be able to prove all of the elements of South Carolina common law defamation, his claims might still be circumscribed by the First Amendment protections of speech."  370 F. Supp 3d at 614; *see also Davis v. New Penn Fin., LLC*, No. CV 6:18-3342-TMC-KDW, 2021 WL 3410790, at *17 (D.S.C. May 25, 2021), *report and recommendation adopted*, 2021 WL 3088059 (D.S.C. July 22, 2021) ("[A] common law defamation claim must also comport with the First Amendment.").  Thus, to the extent that Plaintiffs allege that it was improper for the Magistrate Judge to "*sua sponte* raise a First Amendment defense," ECF No. 69 at 7, the court disagrees and finds the Report correctly analyzed Defendant's statements under a First Amendment framework to determine if an actionable claim existed.

**B.  Plaintiffs failed to state an actionable defamation claim.**

"There are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual, and that thus constitute speech that is constitutionally protected.  First,

the First Amendment serves to protect statements on matters of public concern that fail to contain a 'provably false factual connotation.'" *Snyder*, 580 F.3d at 219 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)), *aff'd*, 562 U.S. 443 (2011). "Second, rhetorical statements employing 'loose, figurative, or hyperbolic language' are entitled to First Amendment protection" as "[t]he general tenor of rhetorical speech, as well as the use of 'loose, figurative, or hyperbolic language' sufficiently negates any impression that the speaker is asserting actual facts." *Id.* (citing *Milkovich,* 497 U.S. at 20–21).

Plaintiffs argue that it was improper for the Report to extend First Amendment protections to Defendant's statements because those statements did not constitute hyperbolic language. Plaintiffs object to the Report's finding that "'no reasonable reader could interpret any of [Defendant's comments] as asserting actual and objectively verifiable facts' about Plaintiffs,"[3] ECF No. 66 at 19, and cite the following statements as assertions of actual and verifiable facts:

- Plaintiffs "break the law . . . over and over again," and use "illegal practices" in their business. ECF No. 1-1.

- Plaintiffs operate a "slave camp" and "prison camp" in Florida. ECF No. 1-1; ECF No. 1-2.

- Plaintiffs' dogs are "fried on an e collar." ECF No. 1-1.

- Plaintiffs tried to artificially inseminate a nine year old dog with pyometra that had never had a litter before. ECF No. 1-3.

[ECF No. 69 at 8.]

---

[3] Although Plaintiffs also object to the Report's finding that Defendant's statements "involve matters of public concern," ECF No. 69 at 18 n.11, the Report found that the statements were protected by the First Amendment because they contained loose, figurative, or hyperbolic language that could not be interpreted as asserting actual and objectively verifiable facts about Plaintiffs, not because they were matters of public concern.

"In determining whether a statement could be interpreted as stating actual facts, or whether the statement is rhetorical hyperbole, courts both 'assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message' and 'emphasize the verifiability of the statement, because a statement not subject to objective verification is not likely to assert actual facts.'" *Kent v. Hennelly*, No. 9:19-CV-1383-DCN, 2019 WL 5896442, at *8 (D.S.C. Nov. 12, 2019) (quoting *Snyder*, 580 F.3d at 219). As such, the Court will review the statements Plaintiffs allege are factual assertions by looking at the plain language, the context, and general tenor of the statements.

### 1. Statement that Plaintiffs repeatedly break the law and engage in illegal practices

The statement that Plaintiffs "break the law . . . over and over again," and use "illegal practices" in their business, ECF No. 69 at 8, comes from the following March 14, 2017 Facebook post by Defendant:

> What a dysfunctional world we live in. It is ok is it to break the law with your dysfunctional rich family over and over again and then hassle intimidate innocent hard workers who have done nothing wrong apart from leaving your slave camp. Shame on you and remember what goes around comes around
> Is it ok to send the heavy brigade to a charity to intimidate them no.
> Perhaps get your own dysfunctional house in order
> Treat people and animals with no respect I don't think so. ...

[ECF No. 1-1 at 2.] In a comment on the same post, Defendant states "it will all come out now about illegal practices I will.psrsonally [sic] shame them. Any body [sic] approached to send a dog to them contact us first I will tell you the truth." *Id.* at 4. The court notes that this post does not name the Plaintiffs in the post or the comments, *see id.*, but the court assumes *arguendo* that the post is specifically referring to Plaintiffs.

Because Defendant characterizes Plaintiffs in general terms as a wealthy family able to "break the law . . . over and over again" and alleges that Plaintiffs engage in "illegal practices" but does

not provide any details about what the alleged illegal practices are or what laws are being broken, the court finds that these statements are too vague to state actual facts that would give rise to a defamation claim.  Courts have found that similarly vague claims could not establish a claim for defamation.  *See Peirce v. Bryant*, No. 4:14-CV-2927-BHH-TER, 2016 WL 3035891, at *6 (D.S.C. Mar. 23, 2016), *report and recommendation adopted sub nom. Peirce v. Thompson*, No. 4:14-CV-02927-BHH, 2016 WL 3017212 (D.S.C. May 26, 2016) ("Plaintiff's deposition testimony that all of the defendants made defamatory statements to the general public about her being 'guilty of stuff' is insufficient to establish a defamation claim."); *McBride v. Sch. Dist. of Greenville Cty.*, 698 S.E.2d 845, 853 (Ct. App. 2010) (finding "vague references to the local newscasts concerning McBrides's arrest . . . are not specific enough to evaluate," but the "allegation that McBride stole school property should go to the jury").

Plaintiffs attempt to distinguish these cases, arguing that in *McBride*, the court inferred that defendant's statement meant the plaintiff stole school property, and noting that the statement in *Pierce* that the plaintiff was "guilty of stuff" was "clearly too vague to constitute actionable defamation."  [ECF No. 69 at 12.]  In *McBride*, the plaintiff's colleague stated "she cleaned us out" after equipment allotted to the plaintiff's classroom was transferred to her colleagues' classrooms, and the court does appear to look at the context of the statement to infer that McBride was being accused of stealing school equipment.  *See McBride*, 698 S.E.2d at 850.  However, the Defendant's post and accompanying comments in the instant case do not provide enough context to discern what illegal behavior Plaintiffs are being accused of.  The other behavior alleged in the post is that Plaintiffs run a "slave camp" and "sent the heavy brigade to intimidate a charity," which the court finds to be clearly hyperbolic language rather than factual examples of the "illegal practices" that Defendant alleges will come to light.  *See* [ECF No. 1-1 at 4.]  The court finds the

allegations of Plaintiffs "break[ing] the law" and engaging in "illegal practices" more akin to the allegation in *Pierce* that a plaintiff was "guilty of stuff," and thus too vague to constitute actionable defamation in the instant case. As such, the court agrees with the Report's finding that the statements are protected by the First Amendment.

### 2. Statements that Plaintiffs run a "Slave camp" and fry their dogs on e-collars

Defendant states in the March 14 Facebook post that "your dysfunctional rich family . . . hassle[s] intimidate innocent hard workers who have done nothing wrong apart from leaving your slave camp," ECF No. 1-1, and in a comment on a March 27 post writes:

> [W]e have met some wonderful people over here have been helped to escape a slave camp by the most genuine people you could wish to meet ever but Florida seems per capita the worst in the world from our experience. The people we were unfortunate to have had connections with in Florida would sell their own mother to save face. If they told you the time you would check your watch.

[ECF No. 1-2.] Again, the court assumes *arguendo* that Defendant's March 14 and March 27 posts are referring to Plaintiffs.

The Court agrees with the Report that the statements referring to Plaintiffs' business as a "slave camp" are clear examples of "loose, figurative, or hyperbolic language" that negate the impression that Defendant was seriously maintaining an actual fact about Plaintiffs. [ECF No. 66 at 19]; *see Milkovich*, 497 U.S. at 2. Plaintiffs attempt to distinguish the "slave camp" language from the statement that Plaintiffs would "sell their own mother to save face," which they concede "any reasonable person would view . . . as hyperbole." [ECF No. 69 at 9 n.3.] However, the court fails to see how a reasonable person would view Defendant's statement that Plaintiffs operate a slave camp as a factual assertion. The court is not persuaded that the "outraged responses" demonstrate that the commenters on the post hold the belief that Plaintiffs were running a slave camp nor that even a careless reader would read it and believe so. *See Greenbelt v. Co-op. Pub. Ass'n v. Bresler*,

11

398 U.S. 6, 14 (1970) ("On the contrary, even the most careless reader must have perceived that the word [blackmail] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable."). As such, the court finds that the statements are protected by the First Amendment.

Similarly, the court agrees with the Report's finding that Defendant's comment "warn[ing] all people dontbsend [sic] dogs to be fried on an e collar by assholes there," ECF No. 1-1 at 3, is protected by the First Amendment. The court finds the term "fried" is imaginative and hyperbolic rhetoric about the use of e-collars, rather than a factual assertion "that Plaintiffs apply electric shocks to their dogs until the dogs are fried." [ECF No. 69 at 8.] Because "no reasonable reader could interpret any of these [comments] as asserting actual and objectively verifiable facts" about Plaintiffs, the statement is protected by the First Amendment. *See* Snyder, 580 F.3d at 223.

### 3. Statement that Plaintiffs tried to artificially inseminate a dog

#### a) Whether the statement contains a factual assertion

On May 25, 2017 (the "May 25 post"), Defendant posted on Facebook:

> Must admit that people's greed for money is incredulous. Horrified to hear that a big corporation to make more money, tried to [artificially inseminate] a nine year old gun shy bitch who had never had a litter before. Thankfully for the poor bitch she was not able to be Artificially inseminated as 'they did not know she had a pyometra. Poor poor girl all to fulfill their greed. Credibility for this corporation is non existent.

[ECF No. 1-3.] The comments on this post include reactions of: "[t]hat's just wrong," "whoa"; and "[d]iscusting [sic] vile creatures," *id.*, which Plaintiffs argue demonstrates that the readers of the statement "clearly interpreted Defendant's assertions as real and provable, rather than figurative or exaggerated representations of Plaintiffs." [ECF No. 69 at 11.] The court agrees with Plaintiffs that whether a corporation attempted to artificially inseminate a particular dog contains a factual assertion capable of being proven true or false.

**b)  Whether the statement refers to Plaintiffs**

"To prevail in a defamation action, the plaintiff must establish that the defendant's statement referred to some ascertainable person and that the plaintiff was the person to whom the statement referred." *Garrard v. Charleston Cty. Sch. Dist.*, 838 S.E.2d 698, 717 (S.C. Ct. App. 2019), *reh'g denied* (Mar. 18, 2020) (quoting *Burns v. Gardner*, 493 S.E.2d 356, 359 (S.C. Ct. App. 1997)).  In the instant case, the court the disagrees with Plaintiffs' conclusion that the unnamed corporation in Defendant's May 25 post refers to Plaintiffs.

Although Plaintiffs allege that Defendant "falsely accused Plaintiffs or their agents of 'trying to AI (artificially inseminate a nine year old gunshy bitch . . . all to fulfull their greed," ECF No.1 ¶ 16, this contradicts the plain language of Defendant's post, which states only that "a big corporation" attempted the artificial insemination, ECF No. 1-3.  *See Fayetteville Investors v. Commercial Builders. Inc.*, 936 F.2d 1462,1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . .  the exhibit prevails."); *Kindred v. Colby*, 50 N.Y.S.3d 26 (N.Y. Sup. Ct. 2015), *aff'd*, 145 A.D.3d 1586, 42 N.Y.S.3d 906 (2016 (finding the plaintiff failed to state a claim for defamation where he alleged in the complaint that the defendant's Facebook status referred to him, but "the reference in the challenged . . . facebook posting states only 'an irate neighbor'" and "[t]here is no evidence submitted to show that this facebook posting, which is the language set forth in the Plaintiff's complaint as a defamatory statement, identifies the Plaintiff, Dennis Kindred, in any way").  Although Plaintiffs insert themselves into Defendant's May 25 post as the "big corporation," the court finds that, like in *Kindred*, the posting fails to identify Plaintiffs in any way.

Similarly, in *Murray v. Pronto Installations, Inc.,* No. 8:20-CR-824-T-24AEP, 2020 WL 6728812, at *3 (M.D. Fla. Nov. 16, 2020), the plaintiff alleged that statements in three Facebook

posts were defamatory *per se* but the district court found that it "need only analyze Murray's statements in the first Facebook post, which mentioned the plaintiff, Irvin, by name. The court reasoned that "[t]he statements in second and third posts—made 10 and 26 minutes later, respectively—do not mention Irvin's name and, thus, when the Court gives consideration only to the four corners of the statements, it finds that they do not constitute defamation per se as to Irvin. Indeed, the Court cannot determine with certainty that the statements in the second and third posts are even about Irvin" *Id.*

In the instant case, none of the posts identify Plaintiffs by name. Although "surrounding circumstances . . . may reasonably imply the identity of an individual not otherwise immediately ascertainable from the face of the allegedly defamatory statement," such circumstances are not present for the May 25 post. *Carter v. Dozier*, No. CIV.A. 2:10-2812-RMG, 2011 WL 2457547, at *4 (D.S.C. May 31, 2011), *report and recommendation adopted*, No. CIV.A. 2:10-2812-RMG, 2011 WL 2434145 (D.S.C. June 16, 2011); *see also Neeley v. Winn–Dixie Greenville, Inc.*, 255 S.C. 301, 178 S.E.2d 662, 665 (S.C. 1971) ("The language used must be such that persons reading or hearing it will, in the light of surrounding circumstances, be able to understand that it refers to the person complaining, and it must have been so understood by at least one other person." (quoting 50 Am.Jur. (2d) 645, Libel and Slander, Sec. 143)).

Viewing all reasonable inferences in Plaintiffs' favor, the court can see how Defendant's March 14 and March 27 posts provide some context in which the court could plausibly infer that Plaintiffs are the intended subject of the posts. The March 27 post and comments discuss a connection in Florida and an organization there that Defendant "escape[d] from," ECF No. 1-2, and on the March 14 post about a "dysfunctional rich family" that Defendant left, commenters indicate that they "know to whom [Defendant] is talking about," ECF No. 1-1. As such, the court

finds that these statements could plausibly refer to Plaintiffs, a Florida-based business that Defendant and her husband were previously connected to but left, and the comments further indicate that it's plausible that some readers understood the statement as referring to Plaintiffs. *See* [ECF No. 66 at 2-3; ECF No. 1 ¶¶ 7-8.]

However, the May 25 post's reference to a "big corporation" and reactionary comments of "whoa," "that's just wrong," and "[d]iscusting [sic] vile creatures," does not lend itself to the same inference. The only potentially identifying information in the statement is the attempted artificial insemination of a nine-year old dog who had never had a litter, which Plaintiffs allege is false as applied to them, and the comments fail to provide any further identifying information or indication that the readers understood the post as implying Plaintiffs were the "big corporation" in question. *See* [ECF No. 1-3]; *Burns v. Gardener*, 493 S.E.2d at 359–60 (finding appellants failed to establish that a statement was derogatory towards them where "the appellants [were] not mentioned, either by name or by implication in the position paper").

The court recognizes that a statement can be defamatory without naming the plaintiff, so long as those reading the statement would have understood it to be about the plaintiff. Here, there is not enough context within the post to determine whether Defendant's statement is intended to refer to Plaintiffs or whether those reading it would have understood it to refer to Plaintiffs. *C.f. AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 508 (W.D. Va. 2013) (finding "construing the allegations in the light most favorable to the plaintiffs," it was plausible that the statement "the Evil Avenue's customers are dumping out of 3 year deals in year 2 to buy Axceler's ControlPoint" was in fact "intended to refer to plaintiff, *Ave* Point, which produces and sells Doc*Ave* software, and that the statement would be so understood by people reading it who are familiar with AvePoint"). In the instant case, defendant's reaction of being "horrified to hear" about "a big

15

corporation['s]" actions could plausibly be about any corporation involved in dog breeding, and the court does not find that those reading the statement would have understood it to be about Plaintiffs.

Drawing all inferences in Plaintiffs' favor, the court does not find that Defendant's May 25 post refers to Plaintiffs or its agents by reference or implication.  As a result, the court finds Plaintiffs have failed to state a claim for defamation.

### c) Whether the statement is capable of a defamatory meaning

Even assuming *arguendo* that the statement refers to Plaintiffs, the court is not persuaded that the statement itself can support a claim of defamation *per se*.  *See Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir.2005) ("The question whether a statement is capable of having a defamatory meaning is a question of law to be decided by the court."); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) ("A defamatory implication must be present in the plain and natural meaning of the words used.").  Here, Plaintiffs allege that Defendant's statement conveyed "Plaintiffs attempt[] to artificially inseminate an aged dog suffering from pyometra 'all to fulfull their greed,'" and argue that the statement constitutes "a specific allegation[] of animal abuse." [ECF No. 69 at 8–9] (quoting ECF No. 1-3).  However, Defendant's post clarifies that the corporation was unaware of the pyometra prior to attempting the artificial insemination, expressly stating "[the dog] was not able to be Artificially inseminated as []they did not know she had a pyometra."  [ECF No. 1-3.]  Thus, to the extent that Plaintiffs allege the attempted artificial insemination of a dog suffering from a pyometra is an allegation of animal abuse, the court does not find the statement capable of a defamatory meaning where Defendant clarified in the same post that the infection was unknown.

The court, therefore, is left to determine whether a statement about Plaintiffs' attempt to artificially inseminate a nine-year old dog who had never had a litter before to "fulfill their greed," is defamatory *per se* as "the meaning or message is obvious on its face." *Erickson v. Jones St. Publishers*, *LLC*, 629 S.E.2d 653, 664 (S.C. 2006); *see also Wilson v. Ward*, No. 89-MO-125, 1989 WL 380480, at *1 (S.C. Ct. App. Sept. 19, 1989) ("An insinuation is actionable only if it is false, malicious, and the meaning is plain." (citing *Tyler v. Macks Stores of South Carolina*, 272 S.E.2d 633 (S.C. 1980))).  The defamatory meaning of Defendant's statement is not obvious and appears to require outside facts and information about dog breeding practices and the age at which dogs are bred, which does not appear within the four corners of Defendant's May 25 post. *See Carey v. Throwe*, 957 F.3d 468, 484 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1054, (2021) ("[W]e are bound here to stay within the four corners of [the alleged defamatory] Facebook post.")  For example, Defendant opines that the corporation lacks credibility and is motivated by greed, but it is unclear whether this characterization is regarding the corporation's willingness to artificially inseminate a "gun shy" dog that was unable to conceive naturally, or whether it is the about the age of the dog involved.

Although Plaintiffs refer to the nine-year old dog as "aged" in their objections, it is not clear to the court that attempting to artificially inseminate a nine-year old dog is such an obviously unacceptable age that the statement is capable of a defamatory *per se* meaning that harms Plaintiffs' reputation as dog breeders, lowers them in the estimation of the community, or deters others from associating or dealing with them.  *See Holtzscheiter v. Thomson Newspapers, Inc.* ("*Holtzscheiter II*"), 506 S.E.2d 497, 513 (S.C. 1998) ("The statement would convey a defamatory meaning if it tends to harm the reputation of Holtzscheiter as to lower her in the estimation of the community or to deter third persons from associating or dealing with her."); *Evanger's Cat & Dog*

17

*Food Co., Inc. v. Thixton*, 412 F. Supp. 3d 889, 898 (N.D. Ill. 2019) (finding an article incorrectly listing the manufacturer of potentially tainted pet food defamatory *per se* because the "false statement directly impugns Evanger's ability to perform in its business (the manufacture and sale of pet food) by asserting that the company produced food that made pets ill)").

This case stands in contrast to those where courts have found that actionable, defamatory statements were made toward individuals involved in animal breeding or rehabilitation. For example, in *Cummins v. Bat World Sanctuary*, C/A No. 02-12-00285, 2015 WL 1641144, at *12– 14 (Tex. App. Apr. 9, 2015), the court held that statements made on social media and animal advocacy websites, including accusations that Amanda Lollar, the president of the defendant corporation, let two bats die from neglect, illegally impersonated a doctor to obtain rabies vaccines, refused to treat her dog's periodontitis against the veterinarian's recommendation, and allowed the condition to worsen to point that dog could not eat and had to be euthanized were defamatory *per se*. The "statements do not merely generally disparage her character or reputation; they ascribe to Lollar 'conduct, characteristics[,] or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful . . . profession,' and as such, they injure her in her profession." *Id.* (alterations in original); *see also Haskins v. Baylis*, 440 F. Supp. 2d 455, 462 (D. Md. 2006) (holding as defamatory statements alleging a dog breeder's addiction to prescription drugs was destroying everything of value in his life because "if true these assertions . . . suggest that Baylis is incapable or unfit to fulfill the obligations of breeding and showing purebred dogs").

This case is also unlike the cases cited by Plaintiffs in support, where the statements accused the plaintiffs of killing animals or being complicit in the killing of animals and thus, the defamatory meaning of the statement was clear. *See* [ECF No. 69 at 10 ("*See, e.g., Harcrow v. Struhar*, 236 Ga. App. 403, 511 S.E.2d 545 (1999) (holding that a letter accusing neighbors of being the "prime

suspects" in a police investigation of the shooting of the defendant's cat was libelous per se); *Hodgins v. Times Herald Co.*, 169 Mich. App. 245, 425 N.W.2d 522 (holding that a letter accusing an animal dealer of supplying "training animals" to be killed by dogs in connection with dog fights constituted actionable defamation); *Gage v. Shelton*, 37 S.C.L. 242, 1832 WL 1517 (S.C. 1832) (holding that the accusation that plaintiff killed defendant's horse by burning down a stable constituted actionable defamation)").]

Unlike the above-mentioned cases, the court does not find that the plain meaning of Defendant's statement ascribes conduct that rises to the level of animal abuse or is otherwise harmful to Plaintiffs' business reputation. Further, the court notes that this statement was posted to Facebook, a platform that encourages individuals to post their unedited, "free-wheeling" opinions and reactions. *See* Murray, 2020 WL 6728812 at *5 (noting "[t]he culture of internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style'" and statements posted online "'are often the repository of a wide range of casual, emotive, and imprecise speech," such that "the online 'recipients of [offensive] statements do not necessarily attribute the same level of credence to the statements [that] they would accord to statements made in other contexts.'" (first citing Cheverud, Comment, *Cohen v. Google, Inc.*, 55 N.Y. L. Sch. L. Rev. 333, 335 (2010/11); then citing O'Brien, Note, *Putting a Face to a (Screen) Name: The First Amendment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases*, 70 Fordham L. Rev. 2745, 2774–2775 (2002))); *see also Mirza v. Amar*, 513 F. Supp. 3d 292, 298 (E.D.N.Y. 2021) ("[T]hat defendant's allegedly defamatory statements appeared on Yelp – an Internet forum specifically designed for the publication of crowd-sourced opinionated reviews about businesses – 'conveys a strong signal to a reasonable reader' that the statements are

defendant's opinion.'" 513 F. Supp. 3d 292, 298 (E.D.N.Y. 2021) (quoting *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407 (1st Dep't 2011)). In *Mirza*, the court found that none of defendant's statements within the Yelp review were actionable, including those asserting that the plaintiffs, a medical practice and its operating physician, used watered-down Botox instead of the purported Voluma product; used "fugazzi" (fake) fillers; that the physician was not a real doctor; a warning to "avoid this sociopathic doctor"; and a claim that plaintiffs were "going against state orders to be closed as [they] are not an essential business." *Id.* at 298–300. The court noted that "[i]t would unduly raise [defendant's] platform to elevate her philippics to the level of defamation." *Id.* at 301.

For the foregoing reasons, the court finds that Defendant's May 25 Facebook post fails to rise to the level of defamation *per se*, and the post does not warrant the entry of default judgment.

**C. The Report did not require Plaintiffs prove actual or implied malice.**

Plaintiffs argue that "the Report identifies 'actual or implied malice' as an essential element of Plaintffs' claim," and South Carolina law "does not require proof of actual or implied malice for *private figures*, like Plaintiffs in this context." [ECF No. 69 at 16.] The court recognizes that in order to prove defamation under South Carolina law, "the plaintiff must show: (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers*, *LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006). However, the Report noted that Plaintiffs were bringing a claim for defamation *per se* and that "[m]alice and damages are presumed in the case where the defamation is actionable per se." [ECF No. 66 at 16] (citations omitted). As such, the Report noted that Defendant's statements alone, if not protected by the First Amendment, "may

constitute a sufficient basis for Plaintiffs' defamation claim." *Id.* at 17. The court, therefore, finds that the Report did not require Plaintiffs to show actual or implied malice or improperly apply South Carolina defamation law to Plaintiffs' claim.

## III.     The Report properly analyzes Plaintiffs' tortious interference claims

Plaintiffs allege they stated sufficient facts to state a claim for tortious appearance and that the Report ignored admitted facts in the complaint. [ECF No. 69 at 20.] Specifically, Plaintiffs cite the Report's finding that "[t]he only identifiable contract in Plaintiffs' complaint concerns the contract with Mckenzie," ECF No. 66 at 22, and argues that "[b]y virtue of her default, Defendant has admitted that she not only interfered with Plaintiffs' contract with James Mckenzie . . . but also with the Orvis Company" ("Orvis"). [ECF No. 69 at 20.]

### A.  Plaintiffs' claim for tortious interference with an existing contract

Under South Carolina law, "[t]o establish a cause of action for tortious interference with contractual relations, a plaintiff must show: 1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages." *Gecy v. S.C. Bank & Tr.*, 812 S.E.2d 750, 756 (S.C. Ct. App. 2018). Plaintiffs allege that: "Defendant, alone or in conspiracy with her husband Robin Watson, interfered with Plaintiff British Gundogs' contract with James Mckenzie, d/b/a Colmorg Kennels British Labradors, relating to the naming and breeding of a dog, 'Brandy,' causing Plaintiffs special damages." [ECF No. 1 ¶ 21.] The court agrees with the Report that this allegation sufficiently identifies a contract between Plaintiffs and McKenzie ("the Mckenzie Contract").

However, the court notes that Defendant is not held to have intentionally interfered with the Mckenzie Contract simply because Plaintiffs allege it in their complaint. *See* Ryan, 253 F.3d at 780. Even assuming *arguendo* Plaintiffs' claim that Defendant admits she interfered with the

contract by nature of her default, Plaintiffs still have not alleged facts in the complaint sufficient to establish a cause of action for tortious interference. As the Report found, "[t]here is no indication of the terms of the contract, how those terms were breached, that Defendant intentionally procured the breach of those terms, how Defendant's actions were not justified, the damages that ensued from the breach, or that Defendant was a 'stranger' to this contract." [ECF No. 66 at 23.]

The Report correctly found that beyond the McKenzie contract, the remainder of the allegations in the complaint discuss general interference with business relationships or alleged prospective contracts, rather than tortious interference with identified contracts. *See* [ECF No. 1 ¶¶ 24–28.] Regarding the alleged Orvis contract, the complaint states only that "Defendant, by improper means, in combination with Robin Watson, interfered with Plaintiffs' existing and prospective business relationships with The Orvis Company, Inc. ("Orvis"), whose marketing, including its Orvis-endorsed breeding program, is a significant and valuable business relationship to Plaintiffs." [ECF No. 1 ¶ 25.] The complaint does not demonstrate the existence of a contract between Plaintiffs and Orvis or allege interference with an identified contract. Nor does the fact that "Defendant and another individual . . . discuss the 'Orvis endorsements'" being released soon, demonstrate the existence of a contract between Plaintiffs and Orvis. *See* [ECF No. 69 at 20] (citing ECF No. 1-1).

Regarding the alleged AKC contract, Plaintiffs allege that Defendant and her husband "by improper means . . . interfered with Plaintiffs' registration of litter SR946222 by misrepresenting Defendant's entry of Robin Watson's signature, with his authority, on AKC registration documents, causing Plaintiffs special damages, including payments made to Robin Watson and diminished litter value." ECF No. 1 ¶ 24. However, the court agrees with the Report's finding that there is no indication of the terms governing the alleged contractual relationship between

Plaintiffs and AKC, how those terms were breached, nor how Defendant's misrepresentation resulted in the damages alleged. See ECF No. 66 at 24–25. As such, the court does not find that Plaintiffs established a claim for tortious interference with an existing AKC contract.

Finally, the court rejects Plaintiffs' argument that they identified an existing contract with "breeders, trainers, and customers, and even provide[d] the names of several of these specific individuals," ECF No. 69 at 26, finding the complaint references only "prospective business relationships" with named individuals. *See* [ECF No. 1 ¶ 28.] Plaintiffs use the example of Defendant's alleged interference with their "efforts to employ Matt Neal and Richard King to manage the British gundog operations," but do not allege interference with an existing employment contract. *See id.* The court finds Plaintiffs have failed to allege facts in the complaint sufficient to state claim for tortious interference with existing contracts.

## B. Tortious interference with prospective contracts

In the complaint, Plaintiffs allege that "[b]ut for Defendant's unjustified interference . . . there was a reasonable probability of Plaintiffs entering into contracts with breeders, trainers and buyers in the dog breeding and training industry," ECF No. 1 ¶ 36, and argue in their objections to the Report that the complaint identifies prospective contracts with the AKC and several named individuals sufficient to state a claim for tortious interference.

Under South Carolina law:

> To assert a claim of tortious interference with prospective contractual relations, the plaintiff must prove that the defendant: (1) intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff. *Crandall*, 395 S.E.2d at 180. A claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party. *See Egrets Pointe Townhouses Prop. Owners Ass'n, Inc. v. Fairfield Cmts., Inc.*, 870 F.Supp. 110, 116 (D.S.C.1994). Under South Carolina law, it is irrelevant that a plaintiff could have realized a better deal "but for" the actions of the defendant because the term "potential" contractual relations does not mean "full" contractual relations. *See id.* At the core, a cause of action for interference with

prospective contractual relations will thus lie only where "the aggrieved party [was] ... unsuccessful in acquiring *an expected contract* due to a third party's intentional and wrongful actions." *Id.*

*BCD LLC v. BMW Mfg. Co., LLC*, 360 F. App'x 428, 436 (4th Cir. 2010) (emphasis added). Moreover, as the Report noted, "South Carolina courts have held that 'a cause of action for intentional interference with prospective contractual relations generally stands following the loss of *an identifiable contract or expectation*,'" and "the allegations must present facts that give rise to some reasonable expectation of benefits from the alleged lost contracts." [ECF No. 66 at 25–26 (emphasis added) (quoting *United Educ. Distributors, LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 328–329 (S.C. Ct. App. 2002))].

Plaintiffs, in their objections to the Report, do not point to any identifiable contract or expectation and argue that requiring "specific details, such as the terms of the contracts and how the terms were breached," is a "heightened level of scrutiny [that] is inappropriate where, as here, Plaintiffs need only allege facts supporting a 'plausible inference'" for their claim. [ECF No. 69 at 21.] The court disagrees that the Report applied heightened scrutiny and points to the above-cited caselaw which clarifies that, to be able to state *a plausible claim* for prospective interference, the Plaintiffs still must show interference with an identifiable contract or expectation.

First, the court addresses Plaintiffs' argument that Plaintiffs provided facts that gave rise to "a reasonable expectation of benefits from the alleged lost contract with The Kennel Club" because "[t]he admitted facts in the Complaint are that Defendant interfered with Kennel Club registration of Plaintiffs' dogs and caused special damages." [ECF No. 69 at 6.] Because Defendant is not held to have admitted conclusions of law due to her default, the conclusory allegation that Defendant interfered is not sufficient to establish a prospective tortious interference claim. Further, as the Report noted there is no indication of the terms of the alleged expected contract,

"how those terms were breached, that Defendant intentionally procured the breach of those terms, how Defendant's actions were not justified, the damages that ensured from the breach, or that Defendant was 'stranger' to this contract." [ECF No. 66 at 23] (citations omitted).

Next, the court addresses Plaintiffs' argument that construing the admitted facts in the light most favorable to Plaintiffs would allow a finding that the specified individuals were "legitimate prospects" for employment contracts. *See* [ECF No. 1 at 6.] Plaintiffs, however, allege only that "on information and belief, Defendant, alone or in combination with Robin Watson, interfered with Plaintiffs' efforts to employ Matt Neal and Richard King to manage the British Gundog operations," and that Defendants interfered with "prospective business relations with Kristy Cousins, Mike Stinson, Matt Neal, Richard King, Neal Duncan, and Matty Lebden." [ECF No. 1 ¶ 28.] As the Report noted, "[n]o further information is offered as to these relationships beyond Plaintiffs' [sic] stating that Defendant advised Kristy Cousins to 'be very wary.'" [ECF No. 66 at 26–27] (quoting ECF No. 1 ¶ 14). The court does not find Plaintiffs alleged facts that identify an expected contract or benefit from these individuals.

The court finds that in the instant case, notwithstanding Plaintiffs' allegations of discovery abuse, Plaintiffs have failed to allege facts *in the complaint* sufficient to state claim for prospective tortious interference.

IV.     **The Report properly analyzes Plaintiffs' civil conspiracy claim**

Plaintiffs appear to again request that the court accept its legal conclusions as fact, arguing that they have stated a claim for civil conspiracy because:

> By virtue of Defendant's default, it is deemed admitted that Robin Watson's individual acts, taken in combination or conspiracy with Defendant, separate and independent from Defendant's own defamation and intentional interference with Plaintiffs' existing and potential business relationships, caused Plaintiffs special damages independent of the damage to Plaintiffs caused by Defendant's defamation and tortious interference.

[ECF No. 69 at 22] (restating ECF No. 1 ¶ 40).

Under South Carolina law, "[a] civil conspiracy . . . consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage." *Lee v. Chesterfield Gen. Hosp., Inc.*, 344 S.E.2d 379, 382 (S.C. 1986) (citations omitted). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. 2009).

The Report correctly found that the above-quoted portion of Plaintiffs' complaint, along with Plaintiffs' allegation that "Defendant Rachael Watson combined with Robin Watson, and perhaps others, for the purpose [of] injuring Plaintiffs, causing Plaintiffs special damages," ECF No. 1 ¶ 39, "without more, [is] insufficient to state a claim for civil conspiracy under South Carolina law, where 'a plaintiff 'must plead additional acts in furtherance of the conspiracy separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim.'" [ECF No. 66 at 28] (quoting *Carson v. Emergency MD, LLC*, C/A No. 6:20-1946-HMH, 2020 WL 5077655, at *6 (D.S.C. Aug. 25, 2020)).

Plaintiffs object, claiming that "the Report applies a heightened level of scrutiny and seeks additional facts unavailable to Plaintiffs due to Defendant's contempt for the court's orders." [ECF No. 69 at 22]. However, because the court finds that the Report looked only to what was required in the *claim* to state a claim for conspiracy, the court finds no error. *See id.* (citing *Carson*, 2020 WL 507765 at *6 (D.S.C. Aug. 25, 2020); *Propel PEO Inc. v. Roach*, C/A No. 6:19-3546 HMH-KFM, 2020 WL 4606551, at *15 (D.S.C. July 25, 2020) ("Special damages must . . . be specifically alleged in the complaint to avoid surprise to the other party.")). As such, the court finds that Plaintiffs failed to state claim for civil conspiracy.

## V.    The Report properly analyzed Plaintiffs' requests for damages, attorneys' fees and costs and whether to hold Defendant in contempt

First, Plaintiffs argue their "request for damages, attorneys' fees, and costs is supported by both the *admitted* allegations in the Complaint (ECF No. 1) and the *uncontested* Damages Estimate and Motion for Attorneys' Fees and Costs (ECF No. 64)," and thus the court should award Plaintiffs their requested $107,441.99 in damages and $22,441.99 in attorneys' fees and costs. [ECF No. 69 at 23.]  However, finding that Plaintiffs failed to state a claim upon which relief can be granted for their claims of defamation, tortious interference, and civil conspiracy, the court agrees with the Report that Plaintiffs are not entitled to their requested damages. *See* [ECF No. 66 at 30.]

Next, Plaintiffs object to the Report's finding that contempt was not justified in the instant case and argue that because Defendant has had "numerous opportunities to comply with her discovery obligations, yet she has continuously refused to do so," this court "should hold Defendant in contempt and award Plaintiffs their reasonable attorneys' fees and costs," ECF No. 69 at 24. Plaintiffs argue that "[b]y denying [them] the relief to which they are entitled, the Court will effectively reward Defendant's noncompliance with the Court's prior orders and basic discovery obligations, while penalizing the Plaintiffs for their inability to obtain discovery from a completely uncooperative Defendant."  [ECF No. 69 at 23.]

The Report recognized Plaintiffs' argument "that Defendant has failed to provide all of the access and responsive documents requested" in the court's May 22, 2020 order but noted the existence of a discovery dispute concerning the order. *See* [ECF No. 66 at 34–35] (noting "the parties dispute whether or not, for example, Defendant is required to provide Plaintiffs access to social media accounts that she claims are not hers" and that Defendant alleges she does not have the log-in and password information for the accounts).  Thus, "[g]iven this dispute and that

Plaintiffs have not put forth argument or case law in support of their position that, for example, Defendant is in contempt of the court's order by not providing access information to social media accounts she claims are not her own," the Report declined to certify facts to this court supporting holding Defendant in contempt.  [ECF No. 66 at 33–35.]

Plaintiffs have not objected to or pointed to any specific errors in the Report's finding that a discovery dispute exists between the parties.  *See Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982) ("A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations.").   Further, Plaintiffs' argument that "Defendant's discovery abuses are 'far broader' than the failure to comply with the court's May 22, 2020 order," does not persuade the court that civil contempt is warranted in the instant case.  [ECF No. 69 at 23–24.]; *see In re Wilson*, No. 98-2831, 1999 WL 976491, *2 (4th Cir. Oct. 7, 1999) ("Contempt is a weighty penalty and should not be casually imposed.").  As such, the court adopts the Report's reasoning and declines to hold Defendant in civil contempt.

## CONCLUSION

After a thorough review of the Report, the applicable law, and the record of this case, the court finds no clear error in the Report.  After *de novo* review of each part of the Report to which Plaintiffs specifically objected, the court adopts the Report, ECF No. 66, and incorporates it by reference herein.  For the reasons discussed above, and in the Report, Plaintiffs' motion for default judgment, ECF No. 64, is **DENIED**, and Plaintiffs' complaint, ECF No. 1, is **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

/s/Sherri A. Lydon
November 17, 2021                              Sherri A. Lydon
Florence, South Carolina                    United States District Judge